### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS
### EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| TERESA RUSSELL | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| Vs. | ) | Case No._____ |
| | ) | |
| HONEYWELL INTERNATIONAL, INC., | ) | **ORIGINAL COMPLAINT** |
| A Delaware Corporation, individually and as | ) | **FOR PERSONAL INJURY** |
| Successor-in-interest to Allied Signal, Inc., | ) | **Jury Demand** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff, Teresa Russell, through undersigned counsel, based on her personal knowledge, information, and belief, as and for her Complaint for damages against the Defendant Honeywell International, Inc. ("Honeywell") a Delaware corporation respectfully allege as follows:

## THE NATURE OF THE CASE

Commencing in 1959 until its most recent shuttering in December 2017, a Plant (the "Nuclear Plant" or the "Plant") located on the outskirts of Metropolis, Illinois processed uranium ore into uranium hexafluoride ("UF6"), a highly toxic radioactive gas used in the production of nuclear reactor fuel and atomic warheads. After its first few years of Manufacturing UF6 for use in warheads, the demand for weapons-grade uranium dwindled, the Plant was shuttered and did not reopen until 1968 when demand for nuclear reactor fuel rebounded.

1.　　For over a half century, winds continuously carried the radioactive and nonradioactive

1

hazardous dust throughout the area in such concentrations that radioactive particles and non-radioactive hazardous wastes are found deposited in soils and buildings covering a wide swath of Massac County and Metropolis.

2.      Ms. Teresa Russell was raised in Metropolis, IL. She lived at least thirty-two years of her life within one mile of the Plant, at 49 John Street, and 46 Adkins street. Growing up, her father, Joseph "Kenny" King worked at Honeywell Metropolis Works for 45 years. She frequently visited her grandfather lived within one mile of the Plant for decades. She would occasionally go to work with her father at the plant, she remembers going in on some Saturdays with him when he would have to work the weekends.

3.      Ms. Russell's father died from complications of colon cancer. Her grandfather was diagnosed with Multiple Myeloma, prior to his death.

4.      In 2011, Ms. Russell was diagnosed with Multiple Myeloma, a blood cancer caused by the radioactive particles and toxic chemicals tortiously released from the Plant. She underwent a year of chemotherapy, which caused her to lose both of her kidneys and subsequently receive a kidney transplant. Further, Ms. Russell underwent two stem cell transplants.

5.      Within the past five years, Ms. Russell has had some success at slowing the cancer's growth and has been in remission for 8 years. She continues treatment, is on medication for her thyroid and for high blood pressure and provides monthly myeloma markers to her doctors. She takes thirteen prescribed medications and seven over the counter drugs every single day.

6.      The cancer has absolutely upended her daily life and plans and dreams of the future. She suffers from pain in her bones, severe abdominal pain and diarrhea. She went into renal failure in 2012 and was on hemodialysis until 2017.  Her treatment has affected her in different ways, including loss of taste, appetite, weakened immune system, she suffers from nausea and throwing

up. She does not heal properly and had bouts with staph infections that would not heal.

7.     Plaintiff is employed as a high school teacher.

8.     As she went about living her life, Ms. Russell did not know she was being exposed continuously for decades to air laden with radioactive particles and toxic chemicals blown out of the Plant into Ms. Russell's homes, neighborhood and community.

9.     Atomic Energy Commission (AEC) filings, now publicly available for review in an obscure library protected by heavily armed security personnel in Maryland's D.C. suburbs, reveal that shortly after the plant's re-opening in 1968 the levels of radiation in soils throughout the community dramatically spiked. Despite such clear evidence that the plant was spreading radiation far beyond its fence, Plant officials and federal regulators for decades consistently assured local officials the Plant presented no risk to the Citizens.

10.     Defendant Honeywell, individually and as successor-in-interest to the plant's prior owner and operator, Allied-Signal, Inc., could have prevented or avoided this contamination with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment. Those omissions render Honeywell's operations not reasonably safe.  Exposure to this radioactive and toxic mixture in the environment through human pathways can cause grave bodily injury and has created a need for a mitigation/abatement program to protect the public from further risk of being harmed by Honeywell's tortious contamination of their properties.

11.     Plaintiff's claims fall within the scope of the Price-Anderson Act.  The facility owned by Defendant which caused the releases complained of herein operated under a Nuclear Regulatory Commission Source Material License to convert natural uranium concentrate into Uranium

Hexafluoride Gas (UF6) and has exposed the Plaintiff to radiation in excess of the dose requirements set forth in 10 C.F.R. § 20.1301. Defendant's breach of its obligations under the Price- Anderson Act caused Ms. Russell's cancer.

## THE PARTIES

12.     Plaintiff, Teresa Russell, now a resident of Paducah, Kentucky, lived at 49 Jon Street and 46 Adkins Street, in Metropolis, Illinois within one mile of Honeywell's UF6 plant in the homes she resided at for a total of about 32 years. Ms. Russell was diagnosed with Multiple Myeloma in 2011 and has been routinely in treatment since that time. She alleges that exposure to radioactive emissions from Honeywell's UF6 plant substantially contributed to her cancer.

13.     Defendant Honeywell International, Inc. is a Delaware corporation with its principal place of business in New Jersey.  Honeywell is the owner, operator and licensee of the UF6 plant that is the subject of this lawsuit. The legal description of the property upon which the UF6 plant sits is as follows: Section 3, Township 16 South, Range 4 East and Sections 33, 34 and 35 Township 15 South, Range 4 East. Honeywell became the owner, operator and licensee via a 1999 merger consummated with a $14 billion stock swap in which Honeywell acquired Allied Signal, Inc., the previous owner of the Metropolis UF6 plant. This action is brought against Honeywell International, Inc., individually, and as successor-in-interest to Allied Signal, Inc.

## JURISDICTION & VENUE

14.     Original jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

15.     Jurisdiction is also vested in this court under 28 U.S.C. § 1332(a)(diversity

jurisdiction). Complete diversity exists in this matter. Plaintiff, Teresa Russell, was a citizen of the State of Kentucky at the time of her diagnosis in 2011. Defendant Honeywell is a citizen of Delaware, its state of incorporation, and New Jersey, its headquarters and principal place of business location. The amount in controversy exceeds $75,000.00.

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.    1968 Comparison

17.    Prior to commencement of operations, Honeywell's predecessor-in-interest, Allied Signal, took soil samples throughout the area to establish pre-operational background because even in 1958 those involved in the nuclear industry knew full well that radioactive emissions presented a threat to the health and welfare of communities surrounding facilities like the uranium conversion plant.

18.    These soil samples established a pre-operational background of 0.4 pCi/g of uranium before the Plant began operation.

19.    Demand for UF6 to support America's nuclear weapons production kept the Plant busy until 1964 when a decreased demand for UF6 prompted Allied Signal to put the plant into a ready-idle state that kept the facility shuttered until 1968 when the burgeoning commercial atomic energy industry led a resurgence in demand for UF6.

20.    Allied Signal collected additional soil samples in 1967 during the preparation of re-starting the Plant.

21.    The Plant began contaminating the community almost immediately after it resumed operations in 1968 from its previously mothballed condition. Within months of the reopening, federal

inspectors (from the Atomic Energy Commission, prior to the NRC's existence) found that air sample data taken from various internal vacuum lines within the Plant showed activity several times greater than the "maximum permissible concentration" for radioactivity in restricted areas.

22.    In the open-air Drum Dump area, federal inspectors found that air samples exceeded permissible levels on an almost daily basis. It is no surprise then that air  fallout and rainwater samples taken around the Plant just after the 1968 restart found radioactivity levels of 10 to 20 times greater than samples taken less than one year before, when the Plant was inactive.

23.    With respect to soil and vegetation, the 1968 samples showed the east side of the Feeds Building had much higher soil contamination than other onsite sample locations in the prior year. For vegetation, radioactivity levels increased over 30 times in the 5 ½ months between October 18, 1967 and May 1, 1968.

24.    It is irrefutable that the Plant's operation contaminated the area with radiation.

**B.    Off-Site Contamination**

25.    As the Cold War drug on and commercial nuclear fuel markets matured, Allied Signal increased the Plant's annual UF6 production capacity from 5,000 tons per year upon licensing in 1958 to 10,000 tons in 1970, to 12,500 tons in 1975, 14,000 tons in 1995, and to 16,500 tons in 2007.

26.    Despite more than a threefold increase in production capacity, the Plant's emission control processes remained largely unchanged throughout the 1970s until the Plant's most recent shutdown in 2017.

27.    By 1982 the Plant had processed over 200 million pounds of uranium and off- site contamination had steadily increased throughout the period as radioactive particles emitted from the Plant accumulated throughout the area surrounding the plant.

28.     According to a report published by Los Alamos National Laboratory in 1982, NRC staff calculated that if an infant lived at the nearest residence to the Plant, the lung dose caused by the UF6 facility would be approximately 42.5 mrem/yr, exceeding the 25 mrem/yr limit set in 40C.F.R. Part 190.

29.     During the second quarter of 1984, the Plant reported that the average airborne radioactivity at its "nearest residence" air monitor exceeded the permissible contamination level specified in its license. The Plant conducted an initial investigation, temporarily shut the Plant down completely, and installed a ring of nine continuous air monitors. Though the Plant's initial investigation did not identify a root cause, it did reveal several possible sources of leaks, including a crack in an ore storage vessel, malfunctioning dust collectors, and ineffective scrubber systems. After extensive repairs to the plant, the observed emissions at the "nearest residence" began to gradually decline.

30.     In addition to air emissions of radioactive particles, the vast quantities of radioactive materials stored at the Plant emit high-energy gamma radiation. Gamma, or "direct," radiation is measured by devices known as thermoluminescent dosimeters ("dosimeters"). Dosimeters were installed around the fence lines of the Plant and at the Metropolis Airport (which was intended to represent standard or "background" conditions) in 1978.

31.     In 1984, the NRC noted in an environmental assessment report prepared in connection with the renewal of the facility's license that the dosimeter posted at the north site boundary, just 300 feet from the nearest residence, showed a radiation dose rate in excess of applicable levels under the Price-Anderson Act.

32.     Due to this high reading, the NRC mandated that "[t]o determine the direct radiation levels at the residence and to ensure compliance with 40 C.F.R. Part 190 (which limits off-site doses

to a real person to 25 millirem/year), [the Plant] will be required to measure direct gamma radiation on the resident's property. [The Plant] will also be required to measure direct gamma radiation at other nearby locations, such as the residence where the air sampling station is located and at the hotel to the east."

33.     Plaintiff is informed and believes that either: (1) the Plant did not comply with the NRC's directives requiring measurements of gamma radiation, or (2) the Plant did comply with the NRC's directive and later discovered that the results confirmed its violations of the Price-Anderson Act. Plaintiff has not unearthed the results of any gamma radiation testing mandated by the NRC, if such testing in fact ever occurred.

34.     Plaintiff's investigation does reveal, however, that in 1987, the Nuclear Plant purchased all residential properties across from the Plant property along U.S. Route 45, from the union hall to Airport Road (a stretch of over half a mile), for $350,000 (a very significant sum at that time) and demolished all of the then-existing structures. The previous location of these homes is indicated in yellow on the satellite imagery attached hereto as Exhibit B. Plaintiff alleges that the circumstances and timing of these real estate purchases and the demolition of the buildings are suspicious and strongly suggest radiation exposure beyond that allowed by law.

35.     The Plant listed its residential property purchases in a 1990 license renewal application and designated them as a completed major project of the Plant's ALARA Committee (again, the Committee formed at the Plant having the responsibility for maintaining compliance with radiation protection standards and keeping radiation levels "as low as reasonably achievable"). There is no further information relative to the property transactions in the Plant's renewal application or any other publicly available NRC document.

36.     It should be noted, however, that because the Plant bought out its neighboring properties, the location of its "nearest resident" contamination monitoring changed over time: The

Plant actively eliminated its initial "nearest residents" and chose a new "nearest resident" station several hundred yards further away (presumably outside what the Plant perceived to be a hot zone of gamma radiation). Thus, the Plant's 1995 license renewal environmental assessment reflects a change in the "nearest resident" sampling station, which it chose to move to Mt. Mission Road, where it is today.

37.    Plaintiff alleges based on the evidence adduced that the Plant's original "nearest residents" were exposed to radiation far in excess of acceptable limits in violation of the Price-Anderson Act, and that the Nuclear Plant bought and destroyed the houses rather than upgrading its inadequate radiation controls to bring the facility into compliance.

38.    Ms. Russell resided as close as 0.8 miles from The Plant for 32 years, until she moved to Paducah, Kentucky in 2003.

39.    There is no question of fact: The Plant leaked radioactive and hazardous contamination offsite into the community in various pathways. That contamination has not disappeared and remains to this day.

40.    The pathways of exposure are not merely hypothetical. Honeywell's radioactive contamination is found throughout the community. It is found in the creeks leading all the way to the Ohio River. It is found in community members' personal property. It is found in their attics and in the front yards where their children play.

C.    **Ms. Teresa Russell's Exposure:**

41.    Environmental evidence indicates that property and persons in Metropolis were exposed to toxic and radioactive substances and negatively impacted by toxic and radioactive releases from the Plant.

42.    Plaintiff's environmental sampling and scientific testing of properties throughout the

9

Metropolis area reveals the presence of radioactive and toxic materials consistent with those expected to be found in a facility converting uranium ore into uranium hexafluoride gas, such as the Plant. The fact that the concentration and detection frequency of uranium associated with Defendant's operations declines the farther one gets from the Plant, and that by far the highest levels were found at the residences closest to the Plant, further implicates Honeywell.

43.    Tests reveal the presence of these radioactive and toxic materials on properties in close proximity to the homes where Ms. Russell has resided.

44.    Toxic, radioactive contamination found on the nearby properties is linked to the Plant as the exclusive source by the sampling results. First, the contamination itself is of the particular type emitted by the Nuclear Plant and not emitted by any other nearby facilities, ruling out alternative sources. Second, toxic radioactive contamination is found in increasingly higher amounts nearer the Plant; this is a dead giveaway that it is the source of the contamination.

45.    Upon information and belief, Ms. Russell's lifetime dose of radiation emitted from the Plant is well above accepted cancer-causing doses.

**D.    Source Term**

46.    Honeywell has NRC, RCRA, EPA Toxic Substances Control Act, Clean Water Act, and Clean Air Act permits. But these permits do not allow Honeywell to emit uranium in quantities that violate strict federal "dose" standards, nor to emit any contamination that is not expressly allowed by permit term. An "emission" standard limits quality and quantity of releases at the point of release, whereas a "dose" standard limits the health risk at the point of contact with the receptor (e.g., humans).

47.    The "dose" is a calculable number that represents the health effects of low levels of ionizing radiation on the human body and the probability of radiation induced cancer and genetic

damage. A "dose" cannot be directly measured but instead must be computed using a scientific model that starts with a "source term" and factors in all the pathways for exposure of the radioactive material, the ways the material is transported and deposited through the body, the different biological effects of different radioactive materials, and the age and other factors about the individual who is exposed. Annual limits on doses are the primary way federal regulations define a standard of care aimed at the exposure of workers and the public to ionizing radiation.

48.    The "source term" refers to the total amount of radioactive material released in the environment from a site over a specified period of time. Releases can be to the atmosphere, to surface waters, to groundwater, or to soil. An analysis of the "source term" is the starting point for any assessment of a radiation dose the public has received from exposure to radioactivity and its radiological consequences. "Source term" is also critical to evaluate the additional risk of cancer to the Plaintiff.

49.    The Price-Anderson Act sets forth that citizens impacted by a nuclear incident can recover damages. In the wake of Three Mile Island, federal courts began to use federal regulatory radiation dose limits as the relevant standard of care.

50.    Honeywell's source term (and therefore dose) reporting was vastly underestimated due to the faulty and inadequate air monitoring program in place, its historic underreporting of emissions, violations of permits setting allowable emission limits from licensed stacks and vents, worker accounts of regular leaks and spills and the results of the soil sampling conducted by Plaintiff's experts which reveal substantial levels of contamination to the surrounding environment far in excess of what was reported.

51.    All of these factors contribute to the facility's Source Term and taking them into consideration, Plaintiff is informed and believes that the true Source Term over the life of the Plant is over three times greater than Honeywell's public representations.

11

52.    Honeywell monitors certain emissions at certain times from certain locations on Plant property. Honeywell also reports those emissions in order to establish whether the Plant is within its emissions license limits. But the Plant's actual emissions are more accurately identified by analyzing the property around the facility. This is because Honeywell's emissions reporting and NRC license application relies on Honeywell's own self-reporting, but the accuracy of Honeywell's reporting is questionable.

53.    For example, while Honeywell monitors the Nuclear Plant's stacks, ventilation points for air emissions from the buildings, and fence line air monitors, it fails to address releases from outdoor storage and from resuspension, which are aerated by wind, carrying it offsite into the community.

54.    Further, Honeywell's monitoring protocols have been ineffective. From 1968 until 1978, the only form of monitoring for the release of uranium into the surrounding community were two continuous air monitors placed at the fence line of the Plant. This system stayed in place until 1978, when the Nuclear Plant began to implement the monitoring system that still exists onsite today.

55.    Apart from the two air monitors, prior to 1978, personnel at the Nuclear Plant used gummed fallout paper (akin to flypaper) at a handful of monitoring stations to measure airborne nuclear contamination. Honeywell's predecessor, Allied Chemical, conceded that the flypaper method of air monitoring does not produce accurate results and is unreliable since data comparisons between the paper and the air monitors showed "no correlation."

56.    In 1980, Defendant added five additional continuous air monitors to the fence line (for a total of 7), and, for the first time, two off-site continuous air monitors to monitor for radioactive emissions into the community. One off-site monitor was stationed at the "Nearest Resident" area immediately across from the Nuclear Plant's U.S. Route 45 entrance (note that, as set forth herein, the "Nearest Resident" location moved after the Plant's suspicious purchase in 1987 of all of the

nearest residences in the area); the second was located at the Metropolis Airport, about one mile away. The Metropolis Airport location was to serve as the point of comparison to illustrate "background" or standard environmental conditions in the community.

57.     After 1980 therefore, in addition to sampling from the stacks, Defendant relied on just 7 fence-line air monitors, and just 2 offsite monitors, to support its emissions calculations. That system was woefully inadequate. According to Plaintiff's experts, concentrations measured at any one point on the fence line from a release can vary dramatically depending on atmospheric conditions. Thus, the Plant's monitoring system can be expected to underestimate the size of any release by a factor of at least two 65% of the time, by a factor of at least ten 30% of the time, and by a factor of at least one thousand an astounding 10% of the time.

58.     Honeywell has repeatedly violated its permitted emissions limits with illegal emissions. As alleged in the chronology herein, Honeywell has either admitted or been cited by NRC investigators to operate the Facility in a way that has unnecessarily caused many unpermitted emissions.

59.     Honeywell also has a long track record of regulatory violations that suggest shoddy operations and illegal emissions. The timeline set forth indicates that Honeywell was a constant source of contamination problems while all the while increasing its production. And currently, Honeywell admits that further operations will necessarily emit more toxic contamination into the uncontrolled surrounding environment.

60.     The CAP-88 model is an EPA-developed method of calculating air dispersion of radionuclides from a facility, the resulting dose to the community and whether that dose exceeds the regulatory limit established in 40 C.F.R. Part 190, and thus constitutes a violation of the Price-Anderson Act. Since 2013, Honeywell has used CAP-88 modeling to demonstrate compliance with the regulatory framework. However, as pleaded herein, there is ample evidence that Honeywell

significantly underestimated the amount of radioactive materials released, thereby making its CAP-88 model and calculations inaccurate.

61.     Honeywell does not even attempt to measure its complete Source Term, choosing instead to estimate significant portions of its emissions. The Plant's air emissions are only actually measured from the process stacks, and even then, only uranium emissions are actually measured. Emissions from the exhaust fans are estimated based on the average radioactivity of the floor of the Feeds Building where they are located. Emissions of thorium and radium are estimated based on the ratio of thorium and radium to uranium in the incoming ore concentrate. There is little reason to think the emissions would have the same ratio, even though Honeywell makes that assumption. Indeed, the 1982 Los Alamos study found that the ratio of thorium to uranium actually measured by the continuous air monitors was ten times higher than the ratio in the ore concentrate, strongly suggesting thorium emissions were at least ten times higher than Honeywell reported.

62.     From the data unearthed to date and Plaintiff's investigation of public records, air concentrations of uranium, radium, and thorium that Defendant collected from its air monitors reveal radiation levels that are consistently many times higher than those predicted using Defendant's officially reported emissions to the NRC and application of CAP-88 modelling software, even as far away as the standard "background" air monitor at the Metropolis Airport.

63.     In short, based on the actual sampling data collected from the monitors, Plaintiff alleges, Defendant's "estimated" air emissions data greatly understates the radioactive material actually expelled from the Plant over its history.

64.     The sampling data reported to the NRC showed air concentrations of uranium and thorium as much as 14 times higher than expected for uranium and as much as 185 times higher than expected for thorium-230 for certain monitors in certain years.

65.     Perhaps most troublingly, there is limited, if any, statistical correlation between higher emission levels reported to the NRC and higher air concentrations found by the air monitors. Thus, comparing the reported emission data with the recorded air monitoring data strongly suggests that one or both sets of data are inaccurate.

66.     Comparing average concentrations of uranium from its semiannual monitoring reports from 1989 to 1993 to average concentrations reported from 2001 to 2017 shows an increase 7 to 20 times more than would be predicted from reported emissions and the CAP-88 model.

67.     Furthermore, Plaintiff's investigation of available records and data obtained from the NRC reveals numerous inconsistencies and nonsensical data, raising significant questions about the accuracy and reliability of the data Defendant submitted to the NRC.

68.     That Honeywell's reporting was inaccurate is underscored by the results of soil sampling and testing in the area which show uranium contamination levels far in excess of what would be predicted based on Defendant's officially reported emissions.

69.     Most troubling of all, independent air monitoring conducted by the Illinois Emergency Management Agency (IEMA) confirms that Honeywell's monitoring system has drastically underestimated the Plant's emissions. Since at least 1979, the State of Illinois has conducted independent radiation monitoring in the areas around nuclear facilities across the state, including the Plant. In particular, IEMA maintains continuous air monitors at the Metropolis Airport and at the "nearest resident", two locations where Honeywell also has continuous air monitors, allowing a direct comparison. The results from IEMA's air monitor at the nearest resident for total uranium *are consistently 3 times higher than Honeywell's results from the same location over the same time period.*

70.     Upon information and belief, Honeywell received copies of IEMA's monitoring results

and failed to inform the NRC or the Plaintiff or change any of their practices. Instead, Honeywell continued to willfully mislead regulators and the public as to the extent of their emissions. In order to account for the quantity of uranium found in soil samples taken by Plaintiff, Plaintiff is informed and believes that the Plant must have emitted substantially more uranium than Honeywell admitted in its statements to the NRC. Thus, the sampling results indicate that (1) Honeywell's self-reported emissions data is incomplete (and, correspondingly, that license applications and related environmental reports and environmental assessments undercount and underestimate emissions), (2) sampling results are a more accurate data point for calculating actual emissions from the Plant, and (3) Honeywell has emitted exponentially more toxic contaminants into the community than it admits.

71.     There are violations of federal regulations, including specifically 10 C.F.R. § 20.1301 (and its predecessors).

72.     Based on the Honeywell's reported Source Term of total reported radioactive emissions, the lung dose at the nearest residence from uranium emissions alone calculated by CAP-88 exceeded 25 mrem for adults in 1977, 1979, and 1984, and for 15-year-olds every year from 1977 to 1984 (with the exception of 1982), and again in 1999 and 2014. As noted above, Plaintiff alleges that the evidence strongly suggests that even this is a significant underestimate of community exposure to radioactive emissions.

**E. Willful and Wanton Conduct**

73.     Plaintiff incorporates by reference the allegations contained herein.

74.     At all relevant times, the Defendant owed a duty to refrain from willful, wanton, reckless, and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff.

75.     Upon information and belief, Defendant was aware that it handled substances that are

highly carcinogenic and otherwise harmful to humans.

76.     Upon information and belief, Defendant was aware that there are considerable health risks associated with the emission, release, leak, and discharge of contaminants and waste from the Plant, including the risk of causing various forms of cancer.

77.     Upon information and belief, Defendant was aware that its operations actually resulted in unreasonably dangerous emissions, releases, leaks, and discharges of harmful and hazardous substances into the surrounding communities.

78.     Defendant's failures in its acts and omissions and with actual knowledge of the risks of unreasonable emissions, releases, leaks, and discharges constitutes willful, wanton, reckless, and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of the Plaintiff.

79.     Defendant failed to inform the community and had it done so, Plaintiff could have taken appropriate action to prevent or mitigate her cancer.

80.     As a direct and proximate result of Defendant's willful, wanton, reckless, and outrageous conduct, Plaintiff suffered injury and harm.

### COUNT ONE
*(Violation of the Price-Anderson Act, 42 U.S.C. § 2210 et seq.)*

81.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

82.     Defendants released radiation into the environment in excess of federal regulatory limits applicable under the PAA, including 10 C.F.R. 20.1301.

83.     Plaintiff was exposed to the radiation released by  Defendant. The radiation released by  Defendant was the cause of Plaintiff's injuries.

84.     Plaintiff has suffered injuries, including bodily injury and disease.

85.     The uranium and other radioactive substances processed, handled, stored, and/or disposed by Defendant at the Nuclear Plant include, but are not limited to, nuclear byproduct materials, special nuclear materials, and/or source materials within the meaning of the PAA. 42 U.S.C. § 2014(e), (z), (aa). Any release of these byproducts, special nuclear, or source materials causing bodily injury, sickness, disease, death, loss or damage to property, or loss of use of property constitutes a "nuclear incident" within the meaning of the PAA. *See* 42 U.S.C. § 2014(q).

86.     As set forth below, Plaintiff alleges that 10 C.F.R. § 20.1301, *et seq.* (and its predecessors) applies. Pursuant to 10 C.F.R. § 20.1301 and its predecessor 10 C.F.R. § 20.105, the dose limits contained in 40 C.F.R. Part 190 are applicable.

87.     Defendant's acts and omissions and negligent releases of hazardous, toxic, and radioactive waste materials exposed Plaintiff to these highly dangerous materials in excess of federal regulatory limits (as set forth in 10 C.F.R. § 20.1301, *et seq.* and its predecessors). Plaintiff's injuries were the direct and proximate result of her exposures. Plaintiff's cause of action therefore asserts legal liability based upon a "nuclear incident," or series of such incidents, and is consequently a "public liability action" within the terms of the PAA.

88.     Pursuant to the PAA, the substantive rules for decision in this action arising under 28 U.S.C. § 2210 shall be derived from the law of the State in which the nuclear incident occurred unless such law is inconsistent with the provisions of such section. Here, Illinois supplies the law as the state in which the nuclear incident occurred. Illinois substantive rules provide that a person is strictly liable for harm, injury, or damage arising from an abnormally dangerous/ultra-hazardous/unreasonably hazardous activity. Processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials which pose a significant risk of harm to persons living and working in the vicinity of the operation constitute such abnormally dangerous/ultra-

hazardous/unreasonably hazardous activity under Illinois law.

89.    Defendant's conduct in the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials posed significant risk of harm to persons living and working in the vicinity of the operation. The consequences of nuclear accidents or incidents to health, property, and the environment are extremely dire, and can be measured in millions, if not billions of dollars. It is not possible to eliminate all risk by taking reasonable precautions. Finally, the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials have never been a matter of common usage; indeed, private operators historically were not permitted to engage in such activities at all. The conduct of Defendant's activities at the Plant constituted abnormally dangerous activities.

90.    Defendant owed to Plaintiff a duty of due care which could only be satisfied by the legal, safe, and proper processing, handling, storage, and/or disposal of the radioactive, toxic, and hazardous substances in Defendant's possession. Defendant had a duty to prevent the discharge or release of such substances that might harm Plaintiff.

91.    Further, Defendant had a duty to comply with applicable state, federal, and  local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials. Defendant  applied  for, obtained, and operated pursuant to an NRC license. Defendant is liable for its activities at the site.

92.    Defendant has been and is subject to the provisions of EPA's generally applicable environmental radiation standards in 40 C.F.R. part 190, pursuant to 10 C.F.R. § 20.1301 and its predecessors.

93.    Defendant breached these duties by its negligent, grossly negligent, and reckless processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials at

the Plant. Such conduct was in utter non-compliance with applicable federal, state, and local laws, regulations, and guidelines. Defendant's negligent, grossly negligent, reckless, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the Plant. These actual releases subjected Plaintiff to radiation in excess of federal regulations. Finally, Defendant failed to act to prevent its releases from harming Plaintiff.

94.     Defendant breached its duty by violating federal regulations with respect to levels of radiation and concentrations of radioactive materials in unrestricted (general public) areas.

95.     Defendant knew about the hazards associated with nuclear operations. The legislative history of the PAA, which was passed with the active participation of private companies involved in the nuclear power industry, is rife with references to the extreme consequences that could be expected in the event of a nuclear incident. Indeed, the gravity of such consequences was a major contributing factor to the passage of the PAA. Defendant knew or should have known that its generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic, and hazardous substances, and exposure to gamma radiation from uranium storage, in connection with their operations at the Plant would result in actual injuries and increased risks to the persons, property, and economic interests of the public without taking proper safety precautions.

96.     Defendant's acts and omissions and its negligence were a direct and proximate cause of Plaintiff's injuries, causing both actual present harm and/or creating an increased risk of harm to person. Plaintiff is entitled to recover damages for such injuries.

97.     Because Defendant's conduct was intentional, malicious, grossly negligent, and reckless, Plaintiff seeks punitive damages.

98.     Under the umbrella of Plaintiff's PAA claim, Plaintiff asserts the following state law causes of action.

## COUNT TWO

### (*Negligence and Gross Negligence*)

99.    At all relevant times, Defendant owed a duty of care to Plaintiff to process, handle, store, and/or dispose of hazardous, toxic, and radioactive waste materials at the Plant in a reasonably safe manner and consistent with applicable laws, regulations, and guidelines set forth above, including, to the extent it is applicable, 10 C.F.R. § 20.1301, et seq. and its predecessors.

100.   Defendant breached its duty to Plaintiff by its conduct, acts, and omissions when it processed, handled, stored, and/or disposed of hazardous, toxic, and radioactive waste materials at the Plant, as set forth more fully herein.

101.   Defendant further breached this duty by failing to warn Plaintiff of the risk of harm and actual harm caused as a result of its actions detailed herein.

102.   Defendant's conduct, acts, and omissions in violating its duty of care to Plaintiff created an extreme risk of harm to others, as detailed above. Moreover, Defendant knew of the extreme risk to Plaintiff but proceeded anyway.

103.   As detailed above, Defendant's violations of its duty of care resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the Plant and proximately caused damage to Plaintiff. These actual and continued releases subjected Plaintiff to an unreasonable risk of harm, and exposure to hazardous, toxic, and radioactive substances sufficient to cause the illnesses suffered by Plaintiff.

## COUNT THREE

### (*Ultrahazardous / Strict Liability*)

104.   As set forth herein and at all relevant times, Defendant was engaged in ultra- hazardous or abnormally dangerous activities related to its operation of the nuclear facility.

105.   Uranium processing and other activities described herein are abnormally dangerous activities that cannot be made safe by exercise of the utmost care.

106.   The Uranium processing and other activities undertaken at the Plant resulted in emissions, leaks, spills, and discharges which posed a high risk of serious harm to Plaintiff. The likelihood of serious harm to the population and Plaintiff was great.

107.   It was inappropriate for the Plant to be operated in a populated area that would necessarily result in exposure to the population and Plaintiff of the Plant's emissions, leaks, spills, and discharges.

108.   As a direct and proximate result of Defendant's ultra-hazardous and abnormally dangerous activities, Plaintiff suffered personal injury from Defendant's hazardous, toxic, and radioactive materials in violation of applicable laws, regulations, and guidelines set forth above, including, to the extent it is applicable, 10 C.F.R. § 20.1301, *et seq.* and its predecessors.

109.   The Plaintiff's injuries were the kind of harm the kind of which makes the Defendant's activities abnormally dangerous.

110.   Because the Defendant's activities are ultrahazardous, Defendant is strictly liable for the proximate injuries and consequential damages and injuries.

111.   The Defendant's conduct was willful, wanton, and reckless in its disregard form the rights of others, including the Plaintiff, and punitive damages are thus warranted.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a Jury Trial and for the following relief:

(1)      An award of compensatory damages as a result of Honeywell's acts or omissions for Plaintiff Teresa Russell including but not limited to past medical costs, future medical costs, pain and suffering and emotional distress;

(2)     An award of punitive damages.

(3)     Prejudgment and post-judgment interest;

(4)     Such other relief as the Court or Jury may deem appropriate.

Respectfully Submitted,

*/s/ James F. Clayborne*
CLAYBORNE & WAGNER LLP, #06199209
525 W. Main Street, Suite 105
Belleville, Illinois 62220
Tel: 618.239.0187
jclayborne@cswlawllp.com

Katrina Carroll
Nicholas R. Lange
Kyle A. Shamberg
LYNCH CARPENTER, LLP
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Tel: 312.750.1265
katrina@lcllp.com
nickl@lcllp.com
kyle@lcllp.com

Richard Kruger KRUGER LAW FIRM
110 W. Fifth Street Metropolis, Illinois 62960
Tel: 618.524.9302
richard@richardkrugerlaw.com

Paul Henry
PAUL HERNY LAW FIRM
508 Market St.
Metropolis, IL 62960
Tel: (618) 744-6633
paul@paulhenrylaw.com

Kevin W. Thompson
David R. Barney, Jr.
Stephen Wussow
THOMPSON BARNEY
2030 Kanawha Boulevard, East
Charleston, West Virginia 25311
Tel: 304.343.4401
kwthompsonwv@thompsonbarneylaw.com
drbarneywv@gmail.com
Swussow@thompsonbarneylaw.com

Celeste Brustowicz
Victor Cobb
COOPER LAW FIRM, LLC
1525 Religious St.
New Orleans, LA 70130
Tel: 504.399.0009
cbrustowicz@sch- llc.com
vcobb@sch-llc.com

Ron A. Austin
RON AUSTIN & ASSOCIATES, LLC
400 Manhattan Blvd
Harvey, LA 70058
Tel: 504.227.8100
raustin@ronaustinlaw.com
*Counsel for Plaintiff*